UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CUTTING EDGE SOLUTIONS, LLC,

          Plaintiff,

     v.

SUSTAINABLE LOW MAINTENANCE
GRASS, LLC, et al.,

          Defendants.

Case No.  14-cv-02770-WHO

**ORDER DENYING MOTION FOR A
PRELIMINARY INJUNCTION**

Re: Dkt. No. 13

Plaintiff Cutting Edge Solutions, LLC (CES) moves for a preliminary injunction to prevent

defendant Sustainable Low Maintenance Grass (SLMG) from using SLMG's registered trademark

"CUTTINGEDGE."  For the reasons described below, I DENY the motion for a preliminary

injunction.

## BACKGROUND

**I.**    **CUTTING EDGE SOLUTIONS, LCC**

CES was founded by John Piccirilli in California as Cutting Edge Solutions, LLC in 2001.

Declaration of John Piccirilli in Support of Motion for Preliminary Injunction [Docket No. 13-1],

¶ 1.[1]  It is a leading manufacturer of plant fertilizers, nutrients, and additives marketed to home

gardeners and hydroponic growers.  *Id*. ¶ 2.  It has been and is a pioneer in the growing field of

hydroponics, where plants are grown in water without soil, although CES has also pioneered the

"use of soil with hydroponic nutrients."  *Id*.  It has sold its products in every state since 2008

through a network of distributors and retailers.  *Id*. ¶ 13. Its products are also sold online through

---

[1]  SLMG objects to various statements made by Piccirilli in his Declaration, on the grounds of
speculation, impermissible legal conclusion, and lack of foundation.  *See* Exhibit 1 to Opposition
[Docket No. 36-1].  SLMG's evidentiary objections are improper because they should have been
included in the text of the Opposition brief itself.  Civ. L.R. 7-3.  In any event, the objections are
OVERRULED.

1    Amazon.com.  *Id*. ¶ 16.  Piccirilli asserts that CES "also sells its plant fertilizers to landscapers and

2    landscaping service providers for use in connection with their work maintaining lawns and

3    outdoor plants."  *Id*. ¶ 18.   But he does not provide any specifics explaining when those sales

4    started, which specific products (among the many hydroponic products CES sells) can be used for

5    maintaining lawns and outdoor plans, or how much of those products it sells to that particular

6    market.

7            In opposition, SLMG submits evidence that the primary market for CES's products is

8    indoor and hydroponic growers.  Declaration of Andrew Blank (Docket No. 37), ¶ 25; *see also*

9    Declaration of Renee D. Sanft [Docket No. 40], ¶ 8, ¶¶ 13-20 (noting connection between CES

10   products/product names to marijuana cultivation).  SLMG points out that CES has provided no

11   evidence of what CES products – which are produced for the indoor/hydroponic market – can be

12   used in soil applications or otherwise for lawn care.  Blank Decl. ¶ 26; *see also id*. ¶ 27 (noting

13   that lawn fertilizers are usually labeled specifically for use on "lawns" and CES's products are not

14   so labeled).

15           According to Piccirilli, CES "has continuously used 'Cutting Edge Solutions' (the 'Mark')

16   as a trademark on its products since January 2001."  Piccirilli Decl. ¶ 6.  CES uses the mark "to

17   distinguish its products and signify source."  *Id*. ¶ 7.  But in support of his statement, Piccirilli

18   provides only two examples of labels from CES products.  The first, a label for CES's "Micro 6-0-

19   0" product was "submitted" to the California Department of Food and Agriculture and "reviewed"

20   by CDFA in October 2002.  *Id*. ¶ 9 & Ex. B.  The label prominently features the text "Cutting

21   Edge Solutions, LLC" and "Mirco 6-0-0."  *Id*., Ex. B.   Piccirilli does not say this label was

22   actually used on a product in commerce, and there is no other evidence that this label was used on

23   the Micro 6-0-0 product in advertising or sales.

24           The second label is one from 2013 for CES's Humtea product, which prominently features

25   "Cutting Edge Solutions" and Humtea.  *Id*. ¶ 8; Declaration of Michelle D. Kahn (as modified)

26   [Docket Nos. 13-2, 15], ¶ 37.[2]  CES provides no other evidence to substantiate its claim or show

27

28   [2]  SLMG objects to statements made in the Kahn Declaration on the grounds of speculation, legal
     conclusion, and lack of foundation.  Docket No. 36-1.  Those objections are OVERRULED.

United States District Court
Northern District of California

1   how "Cutting Edge Solutions" has been used on its labels since 2001, except for a reference to a

2   current Amazon.com page showing "Cutting Edge Solutions, LCC" featured on the label with the

3   product name "Plant Amp." Piccirilli Decl. ¶¶ 16, 17. Piccirilli states that currently CES sells 74

4   fertilizer products (differing in name and size) using "Cutting Edge Solutions" on the label as a

5   trademark. *Id*. ¶ 14. CES has also owned and operated www.CuttingEdgeSolutions.org and

6   www.CuttingEdgeSolutions.com since 2001 and 2002. *Id*. ¶¶ 10-11.[3]

7       In Opposition, SLMG provides evidence of CES labels currently in use. Sanft Decl. ¶ 29.

8   On the majority of those labels, the full company name "Cutting Edge Solutions, LCC" appears.

9   *Id*. On at least one of its current labels, the Humtea label from 2013, CES has dropped the LLC

10   and uses "Cutting Edge Solutions" along with the product name. Second Kahn Decl. ¶ 37.[4]

11   ## II.   SUSTAINABLE LOW MAINTENANCE GRASS, LLC

12       SLMG was organized by Andrew Blank in 2011. Declaration of Andrew Blank [Docket

13   No. 37], ¶¶ 1-2. It developed a low maintenance grass seed that was initially marketed through

14   dedicated distributors to professional organizations and institutions. *Id*. ¶¶ 9-10. The product was

15   called CUTTING EDGE grass seed. The grass seed was later sold through direct-response

16   advertising on television, using an independent distributor first and then in 2013 by Turf and

17   Landscaping Solutions, LLC, an entity that Blank created to take over the direct-response

18   marketing for CUTTING EDGE grass seed. *Id*. ¶ 2, 11. After sales were established, SLMG

19   expanded through dealers and distributors who sell in bulk, *e.g.*, big box retailers like Home

20   Depot. *Id*. ¶ 12. It began using CUTTING EDGE on grass seed sold or advertised in August

21   2011.

22       SLMG uses the mark and its "unregistered" mark "CUTTING EDGE" on product

23   packaging and its websites, using primarily a stylized version in purple and white or purple, green,

---

[3] Piccirilli declares that CES redesigned its labels and logo, and those were displayed for the first time in July 2014 at the Indoor Gardening Trade Show in San Francisco. Piccirilli Decl. ¶ 19. SLMG notes that it does not attend that trade show nor sell its grass seed product to "indoor" gardeners. Blank Decl. ¶¶ 30, 31.

[4] SLMG objects to statements in the Second Kahn Declaration on the grounds of misstating the record, as argumentative, as hearsay, as irrelevant, and as lacking in foundation and personal knowledge. Docket No. 48. These objections are OVERRULED.

and white.  Blank Decl. ¶ 16.  From August 2011 and continuing through the present, SLMG has used CUTTING EDGE only on grass seed, but recently began using it on an ice-melt product.  *Id.* ¶ 19.  In anticipation of product expansion, SLMG filed its intent to use application for fertilizers, but to date, it has not invested in developing a fertilizer and will not "go forward" with a fertilizer until a court resolves the trademark issues with CES or a settlement is reached.  *Id.* ¶ 20.

Blank contends that SLMG does not compete with CES in terms of products or markets.  SLMG does not sell and does not advertise its grass seed as including fertilizers, nutrients, or additives.  *Id.* ¶ 21.  Its market consists of people who grow lawns; homeowners and professional landscapers.  *Id.* ¶ 22.  It first became aware of CES when it received a cease-and-desist letter in March 2014.  *Id.* ¶ 24.  Despite having sold its grass seed under the CUTTING EDGE mark since 2011, Blank had never heard about CES, never seen CES at any trade shows or in trade periodicals, or had any customers or distributors mention or confuse CES's products with CUTTING EDGE grass seed.  *Id.*

Piccirilli from CES asserts that the "organic seed coating" on SLMG's CUTTING EDGE Grass Seed is "problematic" because that coating is a "nutrient" or "additive" that could be confused with CES's products.  Piccirilli Decl. ¶¶ 22, 23.  Piccirilli also points out that the CUTTING EDGE Grass Seed advertises that it uses a "Mycorrhiza Package" on its grass seed to aid in water absorption and retention, and that CES also markets a mycorrhizal product "T-Rex."  *Id.* ¶ 24-25.  Piccirilli argues that SLMG's use of "cutting edge" in connection with "fertilizers, additives and nutrients is likely to be confusing."  *Id.* ¶ 28.  However, SLMG does not produce any stand-alone fertilizers, additives, or nutrients, and has promised to refrain from doing so until the parties' rights with respect to "Cutting Edge" is resolved.  Blank Decl. ¶ 20.  The only thing SLMG currently uses is a coating that allows the grass to better absorb "nutrients" and water from the soil.  Blank Decl. ¶¶ 21, 32; Piccirilli Decl. ¶ 23.  Blank also explains that SLMG's grass seed and seed coating cannot be used in place of any mycorrhizal product carried by CES or anyone else.  Blank Decl. ¶ 33.[5]

---

[5]  Blank explains that SLMG started using mycorrhiza in 2012.  Blank Decl. ¶ 34.

United States District Court
Northern District of California

United States District Court
Northern District of California

1     Since 2011, SLMG has sold approximately one-million pounds of CUTTING EDGE grass

2 seed and has spent over $3.5 million to develop the brand.  Blank Decl. ¶¶ 35-36.  Blank argues

3 that an injunction would seriously damage the business, whose only meaningful profitable product

4 at this point is the CUTTING EDGE grass seed, and that it would cost well over $1 million to

5 rebrand its product.  *Id*. ¶ 25.

6 **III.     TRADEMARK INVESTIGATION AND LITIGATION**

7     SLMG filed an intent to use application to use CUTTING EDGE plus design (85/374399)

8 on grass seed, sod, fertilizer, herbicides, pesticides, and lawn care equipment in July 2011.

9 Declaration of Peter N. Baylor [Docket No. 38] ¶ 3.  On May 3, 2012, SLMG filed a Statement of

10 Use for grass seed with CUTTING EDGE, stating that SLMG first used that mark with grass seed

11 on August 31, 2011.  *Id*. ¶ 6.  That registration was granted and matured as Registration 85/976829

12 on May 30, 2012.  *Id*. ¶ 8. The intent to use application for 85/374399 still remains pending and

13 SLMG has until April 3, 2015 to file a statement of use for the other products listed in that

14 application.  *Id*. ¶ 11.

15     CES filed a trademark application for the word mark "Cutting Edge Solutions" on August

16 27, 2012, for fertilizer and agricultural use.  Declaration of Michelle D. Kahn [Docket No. 13-2, as

17 amended by Docket No. 15], ¶ 2.  The application (85/713849) was filed on an "intent to use

18 basis."  *Id*. ¶ 3.  On December 19, 2012, the USPTO issued an Office Action, which notified CES

19 that SLMG's intent to use application (85/771826 – filed on November 5, 2013 for use of

20 CUTTING EDGE on chemical preparations for melting ice) may present a bar to CES's

21 registration of the mark.  *Id*. ¶ 7, Ex G.  That Office Action also required CES to "disclaim" the

22 descriptive use of "solutions" "apart from the mark as shown" because it merely describes an

23 ingredient, quality, characteristic.  *Id*. ¶ 7.  CES's attorney did not do any investigation into

24 SLMG's actual use because CES was not concerned about the use of CUTTING EDGE with

25 respect to chemical preparations for ice and snow removal.  *Id*. ¶ 12.

26     On January 2, 2013, the USPTO notified CES of another SLMG intent to use application

27 (85/374399), which disclosed an intent to use CUTTING EDGE on fertilizer, herbicides,

28 pesticides, sod, and lawn-care tools.  *Id*. ¶ 13.  As a result of this SLMG application, the USPTO

"suspended" CES's application.  *Id.*  After receiving this correspondence, Kahn "attempted" to investigate CES's use of CUTTING EDGE, but limited her search to use of CUTTING EDGE on fertilizer, herbicides, pesticides, and lawn and garden related products.  *Id.* ¶ 14.  In her Second Declaration, Kahn provides additional information on the exact steps she took do that search – but admits that she did not do any investigation into SLMG's intent or use of Cutting Edge with lawn and garden related products.  Kahn Second Decl. ¶ 4.  Instead, she limited her inquiry by searching only for use of CUTTING EDGE on the USPTO.gov website in the fertilizer class (*id.* ¶ 11), and for herbicides and pesticides.  *Id.* ¶ 17.

Kahn did not search for use of "Cutting Edge" under "general agricultural" use and she did not search by SLMG's name, which would have shown all registered and pending applications held by SLMG.  She also did not search more generally for what products SLMG was selling or using CUTTING EDGE on.  She asserts that because the only thing she had found in her limited search was intent to use, she "had no certainty that Defendant SLMG was actually using the mark." *Id.* ¶ 24.  Based on her belief that almost 50% of intent to use applications never ripen into registrations, she felt no need to do any additional investigation into SLMG's activities.  *Id.* ¶ 26.  She declares that the USPTO never cited SLMG's registered trademark for use of CUTTING EDGE on grass seed in any of the correspondence sent to CES.  *Id.* ¶ 25.

On February 18, 2014, CES filed an Amendment to Allege Use for application 85/713849, showing CES's use of the mark Cutting Edge Solutions.  Kahn Decl. ¶ 5.  On February 24, 2014, prior to receiving the cease and desist letter from CES, SLMG filed an application to use CUTTING EDGE as a word mark in connection with grass seed and sod.  Baylor Decl. ¶¶ 12-14.  The examiner has already approved for publication (a step prior to maturation and registration) the SLMG word mark application.  *Id.* ¶ 17.

In March 2014, CES first contacted SLMG in an effort to resolve these trademark issues.  Kahn Decl. ¶ 14; Second Kahn Decl. ¶ 28.  Kahn did not discover the website operated by SLMG, which evidences actual use of CUTTING EDGE on grass seed and the grass seed coating, until May 29, 2014.  Kahn Decl. ¶ 15.  After settlement negotiations broke down, CES filed this case on June 16, 2014, and filed a First Amended Complaint on August 18, 2014, asserting causes of

action for: (i) unfair competition under the Lanham Act; (ii) common law trademark infringement; (iii) cancellation of federal trademark registration due to priority of use and likelihood of confusion; (iv) cybersquatting, and (v) cancellation of federal trademark registration due to defective assignment.   On July 2, 2014, CES filed this motion for a preliminary injunction, seeking to enjoin SLMG from using "Cutting Edge" on its current and future products.

LEGAL STANDARD

## I.     PRELIMINARY INJUNCTION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (original emphasis).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Alternatively, if the moving party can demonstrate the requisite likelihood of irreparable harm, and show that an injunction is in the public interest, a preliminary injunction may issue so long as there are serious questions going to the merits and the balance of hardships tips sharply in the moving party's favor." *Graham v. Am. Home Mortg.*, 13-cv-03322-RS, 2013 WL 3989676, at *1 (N.D. Cal. Aug. 2, 2013) (citing *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  "[T]hese two alternatives represent extremes of a single continuum, rather than two separate tests.  Thus, the greater the relative hardship to the moving party, the less probability of success must be shown." *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 925 (9th Cir. 2003).

## II.    TRADEMARK INFRINGEMENT

To prevail on a claim of trademark infringement under the Lanham Act, a party "must prove:  (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).  "[A] plaintiff trademark owner must establish a valid, protectable interest in order to proceed to the second prong of the trademark infringement

United States District Court
Northern District of California

7

1    analysis—the likelihood of confusion resulting from the defendant's alleged infringing use."

2    *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 972 (9th Cir. 2007).

3         "[T]he standard test of ownership is priority of use.  To acquire ownership of a trademark

4    it is not enough to have invented the mark first or even to have registered it first; the party

5    claiming ownership must have been the first to actually use the mark in the sale of goods or

6    services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).  Federal

7    registration of a trademark is prima facie evidence that the registrant is the owner of the mark.  15

8    U.S.C. § 1057(b).  "Therefore, the registrant is granted a presumption of ownership, dating to the

9    filing date of the application for federal registration, and the challenger must overcome this

10   presumption by a preponderance of the evidence." *Sengoku Works*, 96 F.3d at 1219.  "However,

11   the non-registrant can rebut this presumption by showing that the registrant had not established

12   valid ownership rights in the mark at the time of registration—in other words, if the non-registrant

13   can show that he used the mark in commerce first, then the registration may be invalidated." *Id.* at

14   1220.  "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users

15   from using confusingly similar marks in the same industry and market or within the senior user's

16   natural zone of expansion." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036,

17   1047 (9th Cir. 1999).

18        "The essence of trademark infringement is the likelihood of confusion, and an injunction

19   should be fashioned to prevent just that." *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters.,*

20   *Inc.*, 559 F.3d 985, 993 (9th Cir. 2009).  "Preventing consumer confusion serves the public interest

21   and there is a strong policy in favor of protecting rights to trademarks." *Stark v. Diageo Chateau*

22   *& Estate Wines Co.*, 907 F. Supp. 2d 1042, 1067 (N.D. Cal. 2012).  However, the moving party

23   cannot simply establish a likelihood of confusion to presume irreparable injury, they "must also

24   proffer separate evidence sufficient to establish a likelihood of irreparable harm." *Herb Reed*

25   *Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1251 (9th Cir. 2013).

**DISCUSSION**

26

27   **I.    IRREPARABLE INJURY**

28        "An irreparable harm is one that cannot be redressed by a legal or equitable remedy

United States District Court
Northern District of California

following trial." *Optinrealbig.com. LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1051 (N.D. Cal. 2004). "In some instances, damage to reputation or goodwill, because it is difficult to calculate, qualifies as irreparable harm." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007). However, broad or vague claims that the plaintiff "may experience a loss of good will and customer confusion" due to the defendants' actions are insufficient to establish a likelihood of irreparable harm. *Id.*

### A.      Delay

SLMG first argues that a preliminary injunction should be denied because CES unduly delayed seeking an injunction to protect its alleged interest in the Cutting Edge mark. As the Ninth Circuit has explained, a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1167 (N.D. Cal. 2011) ("Groupion's delay in moving for an injunction undermines implies a lack of urgency and, thus, further undermines the need for a preliminary injunction.").

SLMG asserts that CES was first on notice of SLMG's use of the mark as of January 2, 2013. Although the PTO notified CES that SLMG was only intending to use CUTTING EDGE on its ice-melt product (85/771826) and a broad intent to use on other products (including grass seed, sod, and fertilizers) (85/374399), CES should have conducted a competent investigation on the USPTO.gov site, from which it could easily have determined that SLMG had a registered trademark for CUTTING EDGE on grass seed. Baylor Decl., ¶¶ 18-22. SLMG's argues that the 18-month delay between being notified by the USPTO of SLMG's applications and the filing of the motion for a preliminary injunction fatally undermines CES's claim of irreparable injury. *See, e.g., Wahoo Int'l, Inc. v. Phix Doctor, Inc.*, 13CV1395-GPC BLM, 2014 WL 2106482 (S.D. Cal. May 20, 2014) (17 month "protracted delay demonstrates the lack of immediacy and urgency to warrant irreparable harm.").

CES responds that where there is a "credible explanation" for the inactivity – including allowing time for investigation into a potential infringers' activities and delay for settlement negotiations – court will excuse delays in moving for a preliminary injunction. *See, e.g., Ocean*

United States District Court
Northern District of California

*Garden, Inc. v. Marktrade Co*., 953 F.2d 500, 508 (9th Cir. 1991) (rejecting delay as ground to oppose preliminary injunction where six-month delay between filing complaint and moving for preliminary injunction was caused by extension requests by defendant and settlement negotiations); *Marks Org., Inc. v. Joles*, 784 F. Supp. 322, 333 (S.D.N.Y. 2011) (excusing 16-month delay "caused by good faith efforts to investigate the facts and law," defendant's delays challenging jurisdiction, settlement discussions and case reassignment); *see also Gidatex, S.r.L. v. Campaniello Imps., Ltd*., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("courts typically decline to grant preliminary injunctions in the face of *unexplained* delays of more than two months." (emphasis added)).

CES asserts that it moved promptly to file the case and move for a preliminary injunction once it had actual knowledge of SLMG's use of CUTTING EDGE on the grass seed and once the settlement negotiations broke down.   I am not concerned by the delay between the date CES admits it had actual knowledge of SLMG's use of CUTTING EDGE on grass seed in April 2014, and the filing of this case on June 16, 2014, and the filing for a preliminary injunction on July 2, 2014.  I am concerned by CES's failure to adequately investigate SLMG's use of Cutting Edge, even after it was on notice of SLMG's broad intent to use applications as of January 2, 2013.  CES admits that it conducted only a limited search on USPTO.gov to determine whether CUTTING EGDE was being used by SLMG or anyone else on fertilizer, pesticides, and herbicides.  CES did not search for use of CUTTING EDGE in agricultural products generally, did not search for applications and registrations under SLMG's name, nor search otherwise (on the internet) for evidence of how SLMG was actually using CUTTING EDGE.  Had it done so, it would have easily discovered SLMG's use of CUTTING EDGE on grass seed and its 2012 registration for the same, the exact mark that CES now seeks to prevent SLMG from continuing to use.

Because the evidence shows that CES could easily have discovered SLMG's registration for and its actual use of CUTTING EDGE on SLMG's grass seed, the delay here cuts against CES's request for extraordinary relief.  *See, e.g.,  Pharmacia Corp. v. Alcon Labs., Inc.,* 201 F. Supp. 2d 335, 383 (D.N.J. 2002) (considering constructive knowledge, what a trademark holder "should have known," in determining whether a preliminary injunction is warranted; the "'should

United States District Court
Northern District of California

United States District Court
Northern District of California

1    have known' standard is satisfied by contrasting the full scope of a party's monitoring practices

2    and the way it addressed marks it truly regarded as violating its rights, with its inactivity with

3    respect to the mark it belatedly seeks to enjoin."); *cf. E-Sys., Inc. v. Monitek*, Inc., 720 F.2d 604,

4    607 (9th Cir. 1983) (denying motion for a preliminary injunction and dismissing suit where

5    "[p]laintiff ought to have discovered defendant's use sooner had it been diligently seeking to

6    enforce its mark.").[6]

7        **B.    Proof of Harm**

8            SLMG also argues that the injunction should be denied because CES has failed to submit

9    any evidence that it is, or is likely to, suffer any kind of irreparable harm if SLMG is not enjoined.

10   As noted above, separate and apart from whether it can show likelihood of success or significant

11   questions on consumer confusion, CES must still submit "admissible evidence and with a clear

12   likelihood of success that the harm is real, imminent and significant, not just speculative or

13   potential." *Groupion, LLC*, 826 F. Supp. 2d at 1167.  In its motion, CES asserts that its "loss of

14   the ability to control its mark . . . creates the potential for damages to its reputation," and that

15   potential damage to its reputation and goodwill necessitate the injunction.  Motion at 23.

16           In Reply, CES attempts to substantiate its claim of irreparable harm by submitting

17   customer reviews of SLMG grass seed from Amazon.com and other online review sites that are

18   negative.  Second Declaration of Laura Chapman [Docket No. 14], ¶¶ 9-10;[7] *see also* Declaration

19   of Molly Newland Tullman [Docket No. 44-2] ¶¶ 4-9.  Some of those reviews characterize

20   SLMG's grass seed as a "rip off" and that it "DOES NOT germinate quickly."  Second Chapman

21   Decl. ¶ 9-10.  CES argues this is "clear" evidence that it is likely to suffer irreparable injury

22   without an injunction.  Reply at 25.

23           There are numerous problems with CES's proof.  First, CES does not indicate how many

24

25   _____

     [6] To be clear, I am not finding that a defense of *laches* would defeat CES's copyright claim.  *But
26   see Brookfield Communs. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1061 (9th Cir. 1999)
     (discussing *E-Systems* and noting that the Ninth Circuit has "applied laches to bar trademark
27   infringement claims, we have done so only where the trademark holder knowingly allowed the
     infringing mark to be used without objection for a lengthy period of time.").
28   [7] SLMG objects to statements made in the Chapman Declaration on the grounds of speculation,
     legal conclusion, and lack of foundation.  Docket No. 36-1.  Those objections are OVERRULED.

reviews of SLMG grass it found or what percentage of those were negative.  Instead, CES's declarant says only that "many" were negative.  Tullman Decl. ¶ 4 (an "abundance" of negative reviews); ¶ 6 ("many of which are negative").  I find it relatively unsurprising that there may be some negative reviews, because SMLG has sold over one million pounds of its product.  Blank Decl. ¶ 36.  The actual significance of the negative customer reviews cannot be determined based on the evidence submitted by CES.[8]  Second, and more fundamentally, there is no evidence of *any* actual or even likely customer or distributor confusion.  CES has failed to explain how its customers – searching for fertilizers and nutrients for indoor and hydroponic purposes – would be misled by negative reviews on grass seed for lawns, which are not grown indoors or hydroponically.  As discussed in more detail below, given the significant differences between the products sold by SLMG and CES and the significant differences in the customers, the chance of consumer confusion on the record before me is low.

Third, despite the fact that SLMG has been selling grass seed using the CUTTING EDGE mark since 2011, and selling the seed with the mycorrhizal coating since 2012, CES submits no evidence of actual customer confusion or that it has suffered harm.  There is no evidence that CES's sales have suffered (or are likely to suffer) because of competition from SLMG or because SLMG has tarnished CES's reputation.  *See, e.g., Herb Reed Enters., LLC v. Fla. Ent't Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (to issue a preliminary injunction, district court cannot rely on "pronouncements are grounded in platitudes" but must cite evidence that "'irreparable injury' is likely in the absence of an injunction,'" and that "legal remedies, such as money damages, are inadequate in this case.").

Both in terms of the delay in moving for a preliminary injunction and the lack of proof to substantiate its claim of likely harm, CES fails to show a likelihood of irreparable injury to justify a preliminary injunction.

---

[8]   I also note that some of the negative reviews submitted address customer service, presumably from Turf or SLMG's prior direct-response distributor.  *See, e.g.,* Tullman Decl., Ex. 4 at pgs. 29 of 72.  Those negative reviews do not and cannot tarnish the quality of CES's *products* or reputation with respect to its customer service.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.   LIKLIHOOD OF SUCCESS ON THE MERITS

"To prevail on its claim of trademark infringement," CES must prove: "(1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc*., 448 F.3d at 1124.

### A.   Protectable Interest in the Mark

Generally, a "senior user" of a mark "has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Communs. v. W. Coast Entm't Corp*., 174 F.3d 1036, 1047 (9th Cir. 1999); *see also Bazaar Del Mundo, Inc*., 448 F.3d at 1125-26. "It is axiomatic in trademark law that the standard test of ownership is priority of use.  It is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Halicki Films, LLC v. Sanderson Sales & Mktg*., 547 F.3d 1213, 1226 (9th Cir. 2008) (ellipses and brackets omitted); *Applied Info. Scis. Corp*., 511 F.3d at 970; *but see Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1158-59 (9th Cir. 2001) ("trademark rights are not conveyed through mere intent to use a mark commercially."). While a "registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration . . . the non-registrant can rebut this presumption . . . if the non-registrant can show that he used the mark in commerce first . . . ." *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1220 (9th Cir. 1996).

SLMG argues, and I agree, that there are questions about how CES has used "Cutting Edge Solutions" from 2001 to date and whether that use has been consistent.  The only evidence that CES used the mark in commerce prior to 2011 is one sentence from Piccirilli Declaration.  But there is no documentary evidence – or detailed facts provided by Piccirilli – showing that use in commerce.  CES submits a copy of a label approved by the CFDA in 2002, but there is no evidence that *this* label was actually *used* in commerce.  *Cf. Chance,* 242 F.3d at 1158-59 ("trademark rights are not conveyed through mere intent to use a mark commercially."). The only other evidence is the Humtea label from 2013, which post-dates when SLMG was using CUTTNG

1    EDGE in commerce on its grass seed.

2        CES argues that SLMG should not be able to challenge the weakness of its evidence of

3    prior use because SLMG has not sought discovery on this issue.  Reply at 9.  However, it is CES's

4    burden to show its entitlement to the "extraordinary" remedy of a preliminary injunction.  CES

5    needed to submit proof sufficient to show it has a strong chance of success on the merits.  Instead,

6    it supplies at most weak evidence – in the form of one sentence lacking any details or specifics –

7    of CES's prior use of the "Cutting Edge Solutions" mark.

8        SLMG also argues that CES's actual use of Cutting Edge Solutions on its products (as

9    shown by the approved 2002 label and on CES's current labels) is that of a trade name: Cutting

10   Edge Solutions, LLC.  As noted above, all of the labels before the Court show the use of "Cutting

11   Edge Solutions, LLC" on the product labels, except for the 2013 Humtea label.  As courts in this

12   District have recognized, determining whether a trade name – which Cutting Edge Solutions, LLC

13   obviously is, as the name of the company – is *also* used as a service mark or trademark "is

14   frequently not easy to make" and "is highly fact specific."  *SunEarth, Inc. v. Sun Earth Solar*

15   *Power Co.*, 846 F. Supp. 2d 1063, 1075 (N.D. Cal. 2012).  "It 'is determined from the manner in

16   which the name is used and the probable impact thereof upon purchasers and prospective

17   customers.'"  *Id.* (quoting *In re Univar Corp.*, 20 U.S.P.Q.2d 1865, 1866 (T.T.A.B. 1991)).  In

18   order to make that determination in this case, I would need to review the text of the labels used by

19   CES from 2001 through 2011.  That review could show, for example, whether CES used "Cutting

20   Edge Solutions, LLC" as a "house mark" in order to designate the source of the product, or was

21   merely used to "'convey information about a corporate relationship.'"  *Id.* (quoting *In re Univar*

22   *Corp.*, 20 U.S.P.Q.2d at 1869).  However, only one "submitted" but potentially not used in

23   commerce label has been provided.[9]  On this record, I cannot adequately determine how CES was

24   using "Cutting Edge Solutions, LLC" on its actual labels through 2011.  This issue, therefore, is

25   not dispositive on the question whether CES has a protectable interest in the mark as a trademark,

26

27   ───────────────
     [9]  CES submits evidence of its use of Cutting Edge Solutions as a trademark on its website, but
28   does not say when the website text it relies on was created.  Reply at 11-12; *see also* Second Kahn
     Decl. ¶ 39.

United States District Court
Northern District of California

but weighs against issuing a preliminary injunction.

### B.        Consumer Confusion

"The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield Commc'ns*, 174 F.3d at 1053.  To determine whether there is a likelihood of confusion, the Ninth Circuit applies the eight *Sleekcraft* factors:  "similarity of the conflicting designations; relatedness or proximity of the two companies' products or services; strength of [the] mark; marketing channels used; degree of care likely to be exercised by purchasers in selecting goods; [the alleged infringer's] intent in selecting its mark; evidence of actual confusion; and likelihood of expansion in product lines."  *Id*. at 1053-54; *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979).

### 1.        Similarity of the Marks

The similarity of the marks is a critical question in the analysis of consumer confusion. *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1205 (9th Cir. 2000).  "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Id*. at 1206. The Ninth Circuit has developed factors for the  similarity analysis: (1) "the marks must be considered in their entirety and as they appear in the marketplace;" (2) "similarity is adjudged in terms of appearance, sound, and meaning;" and (3) "similarities are weighed more heavily than differences."  *Id*. at 1206 (citations omitted).

As an initial matter, I find that the highly stylized use CUTTING EDGE on SLMG's grass seed (stylized text, with specific colors) is dissimilar to CES's use of "Cutting Edge Solutions, LLC" on its labels.  In terms of appearances, as used on the products themselves, the look is not similar.  CES argues that the word marks "cutting edge" and "Cutting Edge Solutions" are highly similar.  CES points to SLMG's use of "cutting edge" when describing its products on its website (Reply at 15), and CES's own use of "cutting edge" as word marks on its own homepage.  *Id*. at 14 ("CUTTING EDGE NUTRIENTS; CUTTING EDGE VENDORS; CUTTING EDGE BENEFICIALS").  However, the fact that both companies use the words "cutting edge" does not mean that the trademarks are similar, at least not on the record before the Court.

CES also notes that on Amazon.com, a search for Cutting Edge returns CES and SLMG products side-by-side with a non-stylized descriptive of "Cutting Edge Grass Seed" and "Cutting Edge SourDee, qt."  Reply at 15.  However, those Amazon.com returns *also* show pictures of the products at issue, which significantly differentiate them.

Finally, CES attempts to "disclaim" the significance of the word "Solutions" in its mark. CES argues solutions is not a "dominant" part of  its mark, relying on the PTO's requirement that CES disclaim the use of solutions.  Reply at 14 & fn.4.  What the PTO required of CES was not the disclaimer of the use of "solutions" but instead the disclaimer of the use of the word "solutions" *apart* from the mark as applied.  Kahn Decl. ¶¶ 7-8 & Ex. G.  In other words, the PTO was telling CES that it could not have any rights to the description term "solutions" independent from its use in signifying its "Cutting Edge Solutions" mark.  *See* McCarthy on Trademarks and Unfair Competition § 19.63 (4th ed.) ("The disclaimer does not have the effect of removing from the registered mark the matter disclaimed. It disclaims only a claim that the federal registration gives an exclusive right in those disclaimed words or symbols per se.  That is, the applicant is merely stating that he is claiming only the whole composite mark as his property, and makes no claim to those particular portions disclaimed.").

While there may be some overlap in the way "cutting edge" is used by both companies on their websites, the physical differences in the actual use of the trademarks on their products is significant.  At most, therefore, this factor weighs only slightly in favor of CES.

### 2.     Relatedness of Products

"Related goods are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d at 348 n.10 (internal quotations omitted). "Related goods are generally more likely than unrelated good to confuse the public as the producers of the goods." *Brookfield Communications*, 174 F.3d at 1055-56 (noting that if the parties did not compete to any extent whatsoever, the likelihood of confusion would probably be remote even though the marks were virtually identical); *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d at 1291 ("Where goods are related or complementary, the danger of consumer confusion is heightened.").  To determine whether goods are related, courts

16

may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and whether the goods are similar in use and function. *Sleekcraft*, 599 F.2d at 350; *see also id*. at 348 n.10 (noting that the touchstone is whether the good are related "in the mind of the consuming public as to the origin of the goods.").

Here, the goods are not related. They are not complimentary. SLMG and CES do not compete for the same customers. SLMG sells only grass seed and an ice-melt product. CES sells fertilizers, nutrients, and additives to the hydroponic and indoor market. While Piccirilli states that some unspecified number of his products could be used for "lawn maintenance and outdoor plants," Piccirilli Decl. ¶ 18, the lack of details to support that assertion (e.g., which specific products, how those products could be applied for lawn maintenance) undermines his claim. That SLMG's grass seed has a "coating" does not make the products more related. Someone searching for fertilizer for their hydroponic/indoor garden will not accidentally be confused or lured into purchasing SLMG's grass seed with its coating that helps grass seed absorb and retain water and nutrients from the soil. Similarly, that the grass seed coating contains a "mycorrhizal package" does not make it related to CES's T-Red mycorrhizal additive. There is no evidence that a purchaser can simply substitute one product for another or even use T-Rex in conjunction with growing a lawn. The products serve distinctly different purposes.

Finally, the fact that the products might be in the same general "agricultural products" category and both show up in the "Patio, Lawn & Garden" section of Amazon.com is not significant given the facts of this case. The products are different, they serve different needs, for largely different markets.[10]

### 3.      Strength of Mark

"The stronger a mark — meaning the more likely it is to be remembered and associated in the public mind with the mark's owner — the greater the protection it is accorded by the

---

[10]   CES asserts that SLMG's intention to expand into fertilizers and pesticides under the same trademark "proves" the relatedness of the goods. Reply at 21. CES's assertion is without basis. The question before me is whether SLMG's *current* products and perhaps products under development are related to CES's products. The two products are issue – grass seed and ice-melt – are not.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    trademark laws." *Brookfield*, 174 F.3d at 1058. [11] The Ninth Circuit uses a two-prong test to

2    determine the strength of a particular mark; looking at the "conceptual strength" and the

3    "commercial strength" of a mark. *GoTo.com*, 202 F.3d at 1207 ("'strength' of the trademark is

4    evaluated in terms of its conceptual strength and commercial strength"). "Conceptual strength

5    involves classification of a mark 'along a spectrum of generally increasing inherent distinctiveness

6    as generic, descriptive, suggestive, arbitrary, or fanciful.'" *Network Automation*, 638 F.3d at 1149

7    (quoting *Brookfield*, 174 F.3d at 1058). "The strength of a mark is determined by its placement on

8    a continuum of marks from generic, afforded no protection; through descriptive or suggestive,

9    given moderate protection; to arbitrary or fanciful awarded maximum protection." *E.&J. Gallo*

10   *Winery v. Gallo Cattle*, 967 F.2d at 1291 (internal quotation marks omitted). "Commercial

11   strength is based on 'actual marketplace recognition,' and thus 'advertising expenditures can

12   transform a suggestive mark into a strong mark.'" *Network Automation*, 638 F.3d at 1149 (quoting

13   *Brookfield*, 174 F.3d at 1058). "Use of similar marks by third-party companies in the relevant

14   industry weakens the mark at issue." *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073,

15   1088 (9th Cir. 2005).

16       CES argues that its mark is suggestive, as "'imagination' or a 'mental leap' is required in

17   order to reach a conclusion as to the nature of the product being referenced." *Filipino Yellow*

18   *Pages, Inc. v. Asian Journal Publs., Inc.*, 198 F.3d 1143, 1147 n.3 (9th Cir. 1999). SLMG

19   contends that the mark, instead, is simply "descriptive" and a weak mark because "Cutting Edge

20   Solutions" only suggests that CES's products are in a "leading position or at the forefront," which

21   is simply description of its products. Opposition at 12-13; *see also Zobmondo Entm't, LLC v.*

22   *Falls Media, LLC*, 602 F.3d 1108, 1114 (9th Cir. 2010) ("By contrast, a merely descriptive mark

23   'describes the qualities or characteristics of a good or service.' . . . . It 'define[s] qualities or

24   characteristics of a product in a straightforward way that requires no exercise of the imagination to

25

26

27   [11]  The Ninth Circuit recognizes "four different categories of terms with respect to trademark
     protection:  (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Filipino*
28   *Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999) (citation
     omitted).

United States District Court
Northern District of California

1    be understood.'" (internal quotations omitted)).[12]  On the record before me, I find that Cutting

2    Edge Solutions is not simply descriptive (as describing the qualities of the products akin to

3    "green" or "healthy") but also suggestive, creating a moderately strong mark.

4         CES also asserts that its mark's commercial strength is good, as CES has sold its products

5    in all 50 states since 2008 and it is a well-known provider of products to the hydroponic and

6    indoor grower markets.  Piccirilli Decl. ¶ 12.  SLMG disputes the commercial strength of CES's

7    mark, arguing that at least one other company that produces fertilizers, herbicides, and insecticides

8    uses "Cutting Edge" as a mark and that numerous other companies use the term "cutting edge" in

9    their description of their services, undermining the commercial strength of the mark.  *See* Sanft

10   Decl. ¶ 22 & Ex. CC & Oppo. at 14-15; *see also* McCarthy § 11:85 ("In such a crowd, customers

11   will not likely be confused by any two of the crowd and may have learned to carefully pick out

12   one from the other."); *Common Sense Media, Inc. v. Common Sense Issues, Inc.*, C 08-0155 CW,

13   2008 WL 220120 (N.D. Cal. Jan. 25, 2008) ("'common sense' is not unique, and the field of

14   registered trademarks including the phrase is crowded.").  CES responds that only one other

15   company is using the term "Cutting Edge" in connection with fertilizers, and that one company

16   (Cutting Edge Formulations) is using Cutting Edge as a trade name, and is incorrectly asserting it

17   has a registration on that trade name.  Second Kahn Decl. ¶ 31.

18        Considering the evidence, I find that CES has demonstrated that its mark – in connection

19   with fertilizers, nutrients, and additives – is relatively strong.  However, because of the significant

20   differences between the actual use of its mark and SLMG's use as well as the significant product

21   and market differences, while this factor weighs in favor of CES, it does not by itself show a

22   likelihood of success.

23        **4.      Marketing Channels**

24        "'Convergent marketing channels increase the likelihood of confusion.'" *Official Airline*

25   *Guides, Inc., v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993) (quoting *Nutri/System, Inc. v. Con-Stan*

26

27   _____

28   [12]  SLMG contrasts its own use of the "CUTTING EDGE" mark as one that is clearly suggestive;
     playing off of the cutting and edging typically required in lawn maintenance which it claims is not
     required as frequently for its low maintenance grass.  Blank Decl. ¶ 13.

United States District Court
Northern District of California

*Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987)).  However, the used of the internet as a marketing

channel is ubiquitous and, thus, does not shed much light on the likelihood of consumer confusion.

*See Network Automation v. Advanced Systems Concepts, Inc.*, 638 F.3d at 1151 ("Today, it would

be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous

marketing channel does not shed much light on the likelihood of consumer confusion."); *see also*

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("Given

the broad use of the internet today, the same could be said for countless companies. Thus, this

factor merits little weight.").

　　　　Here, the evidence demonstrates that CES and SLMG sell their products mostly through

different channels to different clients.  CES uses Amazon.com for direct sales, and then

distributors and retailers who focus on hydroponic and indoor gardening.  Sanft Decl. ¶ 8.  SLMG

has not sold any of its product through the retailers that CES uses.  Blank Decl. ¶ 22.  SLMG uses

direct-response marketing (through television ads), but its product is aimed at a different market.

*Id*. ¶¶ 21-23.  SLMG also focuses on sales to institutional and organizational clients and sells

through big-box retailers.  *Id*. ¶¶ 11-12.  CES does not utilize those channels.  Moreover, the

evidence in the record shows that the companies' products are not shown at same trade shows or

in the same trade publications.  *Id*. ¶ 24.  The markets, therefore, are significantly different.  The

fact that one marketing channel is similar – Amazon.com – is not dispositive.  *Network*

*Automation*, 638 F.3d at 1151.[13]

　　　　On the record in this case, because of the differences in the markets and purposes for

buying the different products, this factor does not support a finding of customer confusion.

　　　　**5.**　　　　**Degree of Care Consumers Use in Selecting Product**

　　　　CES admits that this factor is neutral (Motion at 22), and I agree.

---

[13]  As discussed in more detail on the relatedness factor, this is not a case where the parties sell to
the same general class of purchasers.  In those cases, the dual use of online sales channels might
be problematic.  *See, e.g., Color Me House, Inc. v. Discovery Communs., Inc.*,2013 U.S. Dist.
LEXIS 44264 * 20 (W.D. Wash. Mar. 27, 2013) (companies sell use the same marketing channel
to sell to "same general class of purchasers: parents of young children, and those wishing to
purchase gifts for young children.").

United States District Court
Northern District of California

### 6.      Intent

"When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides*, 6 F.3d at 1394.

Here, there is no evidence SLMG knew of CES or its use of Cutting Edge Solutions, LLC on its labels in 2011 when it adopted its CUTTING EDGE mark.  As discussed above, the marks – as used in commerce – are not similar and therefore "intent" cannot be inferred from SLMG adopting its own highly stylized mark.  CES argues that because SLMG markets its seed as having an organic seed coating which contains mycorrhiza and because CES sells a mycorrhiza additive, it can be "inferred that SLMG had an intent to trade off of Plaintiff's goodwill."  Reply at 23.  However, as SLMG's evidence demonstrates, there is no evidence that CUTTING EDGE grass seed is a substitute or replacement for the T-Rex hydroponic additive.  As explained by SLMG, the mycorrhizal coating acts only to increase water retention and absorption for grass seed germinating in soil.  Moreover, there is no evidence from CES's website that discloses to the public that T-Rex contains mycorrhiza, and therefore, no evidence as to how SLMG could have known about T-Rex containing mycorrhiza.  Sanft Decl. ¶ 26.

Instead, the evidence is that SLMG did not attend the same trade shows as CES and their products were not included in the same trade publications.  Moreover, even if SLMG was able to find CES before it decided on using CUTTIG EDGE, the difference between the uses of the marks ("Cutting Edge Solutions, LLC." vs. CUTTINGEDGE as a stylized design) show no intent of SLMG to build off of CES's alleged use of the mark.

### 7.      Actual Confusion

"Evidence of actual confusion by consumers is strong evidence of likelihood of confusion." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 633 (9th Cir. 2005).  "The focus is confusion with respect to the source of a product or service." *Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp. 2d 1006, 1023 (N.D. Cal. 2009); *see also Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002) ("To constitute trademark infringement, use of a mark must be likely to confuse an appreciable number of people as to the source of a product.").  The absence of evidence of actual confusion may not be determinative, because actual

confusion is hard to prove. *Brookfield*, 174 F.3d at 1050.  However, where competing marks have

been in use for a significant period of time, lack of actual confusion is significant.  *See Am. Int'l*

*Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 835 (9th Cir. 1991)  ("Lack of actual confusion during

such a substantial period of concurrent use in the same geographic market establishes there is no

likelihood of confusion; if confusion were a real problem, it would have happened already.").

Here, there is no evidence of actual confusion.  SLMG's grass seed has been on the market

for over three years, including two years with the use of the "coating."  Yet CES provides no

evidence from customers, distributors, or anyone else of confusion between CES's and SLMG's

products.[14]  Moreover, I find that on this record, customer confusion is unlikely given the

significant differences between the products and the customers for SLMG's grass seed and CES's

hydroponic solutions.

### 8.   Likelihood of Expansion

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a

'strong possibility' that either party may expand his business to compete with the other will weigh

in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (internal

quotations omitted).  This factor would normally weigh in favor of CES's request for relief,

because SLMG filed "intent to use application" for fertilizer and nutrients with the USPTO.

However, SLMG has expressly agreed to refrain from expanding its business into fertilizers and

stand-alone nutrients until rights to the mark are resolved by a court or by settlement.  Blank Decl.

¶ 20.  This factor, therefore, is neutral.

On balance, reviewing the *Sleekcraft* factors, CES has not shown a likelihood of success or

that serious questions have been raised on the merits based on the record before me.

### III.   BALANCE OF HARMS

Even if CES had shown serious questions on the merits, CES would still be required to

show that "the balance of hardships tips sharply in [its] favor." *Graham*, 2013 WL 3989676, at *1

(citing *Cottrell*, 632 F.3d at 1131).  "In evaluating the balance of hardships a court must consider

---

[14]  SLMG's Blank declares that none of his customers or distributors have ever mentioned CES or
confused CES's products with SMLG's.  Blank Decl. ¶ 24.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the impact granting or denying a motion for a preliminary injunction will have on the respective

2    enterprises.  Thus the relative size and strength of each enterprise may be pertinent to this

3    inquiry."  *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc*., 4 F.3d 819, 827 (9th Cir. 1993).

4            Here, in the absence of any evidence of actual confusion – or diminished sales or

5    tarnishment of CES's products due to the ongoing sales of the grass seed – there is little support

6    for CES's claims of harm.  On the other hand, SLMG would suffer significant injury if it was

7    enjoined from its current marketing and sales of its only profitable product; CUTTING EDGE

8    grass seed.  As explained by the declaration of Andrew Blank, SLMG invested over $3.5 million

9    to build its brand, has sold over a million pounds of its product, and it would cost SLMG – at a

10   minimum – over $1 million to rebrand.  The balance of harms clearly tips against granting the

11   motion for a preliminary injunction.

12           Considering the merits – proof of a protectable interest and consumer confusion – I find

13   that CES has failed to show a likelihood of success or that substantial questions on the merits have

14   been raised.  CES has also failed to show that irreparable harm is likely.  Finally, the balance of

15   hardships tips sharply in SLMG's favor and against entry of a preliminary injunction.  On the

16   record before me, CES's request for a preliminary injunction must be DENIED.

## CONCLUSION

18           The motion for a preliminary injunction is DENIED.

19           **IT IS SO ORDERED**.

20   Dated: October 20, 2014

                                                 WILLIAM H. ORRICK
                                                 United States District Judge